UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THERESA HEUSER, | ) |
| Plaintiff, | ) Case No. 11 C 2670 |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| MICHAEL ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, Theresa Heuser, pursuant to 42 U.S.C. § 405(g), moves to reverse and/or remand the final decision by the Commissioner of the Social Security Administration ("SSA") denying her application for social security benefits (doc. # 19). The Commissioner filed a cross motion for summary judgment asking us to affirm the ALJ's decision (doc. # 24). For the following reasons, we grant plaintiff's motion for remand, and deny the Commissioner's motion to affirm.

### I.

On February 2, 2008, Ms. Heuser applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging she became unable to work on the onset date of January 1, 2000, due to her disability, which she described as a memory problem (R. 118, 165-66). After her disability applications were denied initially and upon reconsideration (R. 58, 69), Ms. Heuser sought and received a hearing before an administrative law judge ("ALJ") on September 10, 2009 (R. 18). At the hearing, Ms. Heuser's attorney orally amended the onset date to August 1, 2007 (R. 23), and both Ms. Heuser and Vocational Expert ("VE") William

---

[1] On September 9, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was referred to this Court for all further proceedings, including the entry of final judgment (doc. # 17).

Newman testified (R. 20). On October 2, 2009, the ALJ issued a written decision denying benefits and finding that Ms. Heuser was not disabled under the Social Security Act ("the Act") (R. 17). The Appeals Council denied review (R. 1), making the ALJ's decision the Commissioner's final decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## II.

Ms. Heuser was born on December 14, 1958 (R. 118). She is a widow, and has a daughter and a grandchild (R. 322). Ms. Heuser shares an apartment in DuPage County with a roommate (R. 23). She has a General Education Degree (R. 22). Since 1994, Ms. Heuser has worked part-time as a cashier or waitress (R. 183). Since January 1997, her jobs have lasted from one to four months (R. 215). At the time of the hearing, Ms. Heuser was employed for about nine hours per week as a personal assistant to a woman she met in Bible study (R. 35).

### A.

Ms. Heuser has a rather lengthy medical history. We recount that history below.

In the ten years prior to her alleged onset date of August 1, 2007, Ms. Heuser had been admitted to Good Samaritan Hospital ("GSH") on several occasions for ailments relating to alcoholism and depression. On March 12, 1998, she was admitted to intensive care at GSH after falling while intoxicated and striking the back of her head on concrete (R. 346-49, 367). CT scans revealed extensive bleeding in her brain (R. 341, 344, 353), and a CT scan from December 24, 2004, showed softening of her brain tissue with mild generalized atrophy out of proportion to her age (R. 339).[2]

---

[2] Although Ms. Heuser's brief refers to the December 24, 2004 exam as an MRI, the record shows that the test was in fact a CT scan.

Ms. Heuser was again admitted to GSH on December 6, 2000, and a DuPage County crisis evaluator diagnosed her with acute depression with suicidal ideation, alcoholism, and multiple lacerations to her left wrist, right elbow, abdomen, back, and buttocks (R. 361). Ms. Heuser was then transferred to Elgin state mental hospital (*Id.*). In 2005, Ms. Heuser twice entered outpatient treatment programs for alcohol dependence (R. 444). In addition, in undated disability reports, Ms. Heuser stated that in January 2007, she visited Dr. Keith Veselik at Loyola Primary Care Center, complaining of memory loss and depression (R. 253), and that from June 2007 to November 2008, she regularly saw Dr. Sam Deliri for psychiatric treatment for anxiety and depression (R. 277).[3]

On August 28, 2007, Ms. Heuser visited the DuPage County Health Department ("DCHD") crisis center complaining of alcoholism and social phobia as well as anxiety and memory problems (R. 314). Psychiatrist Dr. Susan P. Levine found Ms. Heuser's judgment was poor, her recent and remote memory probably intact, her mood depressed, and her affect anxious (R. 319). Dr. Levine also stated that Ms. Heuser was not willing to take medication for depression or social phobia (R. 315). During this examination, Dr. Levine rated Ms. Heuser's Global Assessment of Functioning ("GAF") at 50 (R. 320). A GAF of 41-50 denotes serious symptoms or impairment in social, occupational or school functioning; a GAF of 51-60 denotes moderate symptoms of impairment in these areas. *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011); *Seabron v. Astrue*, 2011 WL 6178825, at *2 (N.D. Ill. Dec. 9, 2011).

---

[3] Although the record does not contain treatment notes from these doctors, neither the ALJ nor the Commissioner question that these doctors treated Ms. Heuser during the specified time periods.

3

## B.

On April 8, 2008, the Department of Disability Services ("DDS") issued the first of multiple reports on Ms. Heuser. DDS psychiatrist Joseph Martin Nemeth, III conducted a psychiatric evaluation of Ms. Heuser. He reported that Ms. Heuser denied depression and suicidal ideation, but she seemed apprehensive, sad, and somewhat anxious (R. 322-23). Ms. Heuser reported periods of confusion, disorientation, memory loss, and alcohol abuse, as well as a history of physical and sexual abuse (R. 323). Ms. Heuser told him she had been unable to work full-time for the past decade, and that she had trouble remembering orders at her waitressing job since she injured her head in March 1998 (R. 322). She noted that she had been binge drinking since 2003, though the periods between binges had been increasing (*Id.*). She heard voices after drinking episodes, although they did not direct her to harm herself or others (R. 323).

On May 6, 2008, state agency psychological consultant Tyrone Hollerauer, Psy.D., filed a Psychiatric Review Technique Form ("PRTF") (R. 324-36). He found Ms. Heuser had the following medically determinable impairments: anxiety, social anxiety, and alcoholism (R. 329, 332). He reviewed Dr. Nemeth's diagnosis of alcoholism with a history of alcoholic hallucinations, cognitive disorder not otherwise specified, and a history of head injury, noting that Ms. Heuser had some trouble remembering digits backward at the examination (R. 336). Dr. Hollerauer also consulted DCHD records, which included notes from a telephone interview in which Ms. Heuser had sounded depressed and "out of it," and could not remember half of what was discussed (*Id.*). He found Ms. Heuser partially credible due to her history of alcoholism with hallucinations, and he determined that Ms. Heuser was "essentially intact for memory and cognition," despite Dr. Nemeth's evaluation (*Id.*). Dr. Hollerauer noted that she

4

exhibited no memory problems at an August 2007 examination, and her memory problems come and go with her drinking (*Id.*).

Dr. Hollerauer did not complete the portion of the PRTF covering the Paragraph B criteria, the Rating of Functional Limitations (R. 334). Nonetheless, he concluded that Ms. Heuser's alleged impairments were not severe and did not meet the criteria for Listing 12.06, anxiety related disorders, or Listing 12.09, substance addiction disorders (R. 324, 329, 332). Also, Dr. Hollerauer found the evidence insufficient to establish a mental disorder under Listing 12.02 because there was "no evidence of any serious decline in cognitive functioning that is not related to her drinking" (R. 325).

## C.

On June 27, July 2, and July 3, 2008, Ms. Heuser received psychological testing at DCHD. Joy Prepejchal, a clinical psychology intern, and Jean Roe, Psy.D., a licensed clinical psychologist, conducted the testing to clarify Ms. Heuser's diagnosis and determine her cognitive strengths and limitations (R. 380). At the time, Ms. Heuser was receiving services through DCHD's Mentally Ill Substance Abuser program (*Id.*). Ms. Heuser reported that her father touched her inappropriately as a child (R. 380), and as she grew older, she had a history of exchanging sex for money or housing (R. 381). She was married from 1979 to 1995, but left her husband out of fear for her and her daughter's safety because he was a violent substance abuser (*Id.*). Ms. Heuser stated that her head injury in 1998 "left a hole in [her] brain," and she continues to experience problems with her memory (*Id.*).

In tests for cognitive functioning, Ms. Heuser demonstrated average intelligence, but performed in the bottom one percentile of her age group for memory recall (R. 384). The tests revealed that Ms. Heuser had serious difficulty recalling the source of information, moderate

difficulties with remembering false information, some difficulties with retrieving visual information from memory, and some difficulty drawing reasonable conclusions (R. 382). Dr. Roe and Ms. Prepejchal opined that Ms. Heuser's cognitive difficulties with average intellectual abilities indicate her memory problems may be due to her 1998 head injury and alcoholism (R. 383). Ms. Heuser feels bad about her past and has anxiety about the future (R. 382). While she is helpful and cooperative and would like close relationships with others, she emotionally distances herself through drink and has a "considerable level of discomfort and anxiety in her dealings with other people" (R. 383).

Dr. Roe and Ms. Prepejchal's report stated that on the surface, Ms. Heuser "appears to have sufficient psychological resources to manage the stresses of her daily life," including complex and chaotic situations (R. 382). They diagnosed Ms. Heuser with Post Traumatic Stress Disorder ("PTSD"), chronic alcohol dependence, non-specified cognitive disorder, and a history of traumatic brain injury (R. 383). They gave her a primary diagnosis of PTSD because "it is likely that her use of alcohol is a form of self-medication aimed a[t] preventing the disturbing awareness of memories and patterns from her past" (*Id.*). They assessed Ms. Heuser's GAF at 55 (*Id.*).

On September 10, 2008, state agency consultant Glen Pittman, M.D., reconsidered Ms. Heuser's alleged impairments – listed as memory loss, alcohol dependence, depression, dementia, and head injury – in light of additional medical documents received in August 2008 (R. 385-87). Dr. Pittman affirmed the May 6, 2008 "PRTF/MRFC" (PRTF/mental Residual Functional Capacity) assessment, even though Dr. Hollerauer had not completed the functional limitations portion of the PRTF (R. 387). Dr. Pittman noted that Ms. Heuser stated her condition

had not worsened since Dr. Hollerauer's report, and Ms. Heuser's allegations were only partially credible due to her history of alcohol abuse with hallucinations (*Id.*).

**D.**

In March 2009, Ms. Heuser saw Dr. Pitrak for a physical to qualify for "residential living" through DCHD (R. 283). On April 16, 2009, Ms. Heuser made the first of six documented visits to DCHD psychiatrist Dr. Samar Mahmood (R. 425-36).

Dr. Mahmood observed that Ms. Heuser had a history of sexual trauma, suicidal thoughts, and self-injurious behavior (R. 434). She stated that Ms. Heuser had abstained from drinking alcohol since February 5, 2009, and denied any complications from alcohol (R. 433). She also denied depression, mania, or psychotic symptoms, but was "very anxious" and requested medication for anxiety (*Id.*). Ms. Heuser had ongoing symptoms of hypervigilance and difficulty trusting people (*Id.*). She had previously taken Wellbutrin and BuSpar (*Id.*). Dr. Mahmood assessed Ms. Heuser's highest GAF for that past year at 45 (R. 436). She diagnosed Ms. Heuser with PTSD, cognitive disorder not otherwise specified, and alcohol dependence in early full remission (*Id.*). She prescribed BuSpar (R. 441).

In a psychiatric progress note dated April 23, 2009, Dr. Mahmood added a fourth diagnosis of major depressive disorder (R. 431). She noted that Ms. Heuser appeared very anxious and distractible, but her recent and remote memory were "grossly intact" and her thought processes were linear (*Id.*). Ms. Heuser reported side effects from BuSpar, so Dr. Mahmood prescribed Lexapro for anxiety (*Id.*). In a progress note dated May 7, 2009, Dr. Mahmood noted that Ms. Heuser suffered side effects from Lexapro and discontinued that medication (R. 429). Again, she appeared very anxious and distractible, but with grossly intact memory and linear thought processes (*Id.*).

In a progress note dated June 4, 2009, Dr. Mahmood observed that Ms. Heuser was not doing well (R. 427). She appeared very anxious and distractible, was unable to tolerate any social stimulation, and was unable to do anything productive (*Id.*). Nevertheless, her recent and remote memory were grossly intact and her thought processes were linear (*Id.*). Because Ms. Heuser was very sensitive to medications, Dr. Mahmood found it difficult to treat her anxiety (*Id.*). On June 18, 2009, Dr. Mahmood noted that Ms. Heuser had a relapse and left the residential program, but had since returned (R. 426). She was again very anxious and distractible, but her recent and remote memory remained grossly intact (*Id.*).

On July 7, 2009, Ms. Heuser entered the Woodridge Interventions Outpatient Program for substance abuse treatment (R. 300). On July 16, 2009, Dr. Mahmood reported that Ms. Heuser was using Propanolol sporadically for anxiety, but was still very anxious, distractible, and not able to tolerate medications well (R. 425). Although her memory continued grossly intact, her thought processes now exhibited considerable thought disorganization and memory problems; she forgot the sequence of simple daily activities (*Id.*). Ms. Heuser struggled socially and had trouble starting and finishing tasks because of extreme anxiety, poor coping skills, lack of cognitive reserve, and memory problems (*Id.*).

In a Mental Disorders Report dated July 14, 2009, Dr. Mahmood opined that Ms. Heuser's diagnoses of PTSD, major depressive disorder, cognitive disorder not otherwise specified, and alcohol dependence "in early full remission" have lasted, or can be expected to last, at least 12 months (R. 421). She noted that Ms. Heuser was in alcohol rehabilitation residential programming and had "frequent staff interaction," seeing a psychiatrist at least once monthly and a counselor weekly (*Id.*). Dr. Mahmood reported that Ms. Heuser has been on and off medications, but was not currently taking them because of negative side effects (*Id.*). She

8

shuts down under stress; easily becomes confused around supervisors, co-workers and the public; and avoids interaction with groups because it makes her anxious and she prefers to avoid conflict (*Id.*). She noted Ms. Heuser's "significant problems with memory," including problems with "being forgetful[] on jobs," and stated that she "has had great difficulty getting and holding down employment" (R. 422). Dr. Mahmood concluded that Ms. Heuser was unable to function in a full-time work setting (*Id.*). Moreover, she opined that Ms. Heuser's prognosis for change due to treatment was poor to fair (*Id.*).

In an August 7, 2009 letter, Dr. Mahmood again opined that Ms. Heuser's PTSD symptoms and significant memory difficulties had rendered her unable to work full-time (R. 443). Further, she cited the June 2008 psychological tests showing Ms. Heuser scored in the bottom one percent of her age group for memory (R. 442). She opined that her alcohol use had diminished to the point that it was not a contributing factor to her inability to work (R. 443).

On August 13, 2009, Dr. Mahmood completed a rating of the paragraph A and B criteria, and she stated that Ms. Heuser's impairments met or equaled Listing 12.06, for anxiety related disorders (R 424). Under the paragraph A criteria, she reported that Ms. Heuser exhibited motor tension, apprehensive expectation, vigilance and scanning, and "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (*Id.*). Under the paragraph B criteria of functional limitations, Dr. Mahmood found Ms. Heuser's impairment caused marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration (*Id.*).

In a September 3, 2009 letter, licensed clinical counselor Liza McCarty discussed Ms. Heuser's participation in an outpatient alcohol abuse treatment program since July 7, 2009 (R.

9

444). She noted that Ms. Heuser had previously participated in the program in May 2005 and July 2005, but had difficulty maintaining her sobriety (*Id.*). Ms. McCarty stated that Ms. Heuser's substance abuse and mental health issues remained, making it hard for her to maintain employment (*Id.*).

### III.

At the administrative hearing before ALJ Janice M. Bruning on September 10, 2009, Ms. Heuser testified that she had been sober for 30 days prior to the hearing (R. 26). She testified that she gets anxious around people sometimes, and she takes medication for anxiety as needed, about four or five times per week (R. 26, 34).

Ms. Heuser's activities of daily living ("ADLs") include shopping for groceries, cooking, cleaning, and doing laundry (R. 30-31). She attends Bible study weekly and reads the Bible to prepare, but she forgets what she read (R. 33). When she can afford to buy supplies, she enjoys doing crafts (R. 32). About once a month, Ms. Heuser watches her 4-year-old granddaughter for a few hours (R. 31-32). Last summer, she attended a weekly basic computer skills class for five weeks (R. 23-24).

At the time of the hearing, Ms. Heuser was working three three-hour shifts per week as a personal assistant – preparing meals, doing laundry, and cleaning (R. 35). Ms. Heuser testified that the job began as two four-hour shifts (*Id.*), but she could not complete the work in that time period (R. 37). Ms. Heuser testified that she could not do that job 40 hours a week, eight hours a day (R. 36). Ms. Heuser stated that she gets overwhelmed by "soiled things" like dirty dishes or sheets, adding that her employer "sometimes has a problem with incontinence" (R. 35). She testified: "I get this like fear . . . when I try to get any normal jobs . . . I start doing things wrong, make mistakes . . . and the mistakes don't make any sense in my mind when it happens" (R. 37-

38). Ms. Heuser lost two jobs due to mistakes she attributed to memory problems, such as incurring shortfalls at the register while working as a cashier and undercharging as a waitress (R. 38-39).

The VE characterized Ms. Heuser's past relevant work as a cashier as unskilled, light work and her waitressing jobs as semi-skilled, light work (R. 40). The ALJ posited a hypothetical individual of Ms. Heuser's age, education, and work experience who must avoid contact with the public and have only occasional contact with supervisors and co-workers (R. 41). The VE testified that the hypothetical person could not perform Ms. Heuser's past relevant work, but could perform other jobs available in significant numbers, such as laundry laborer, order filler, hand packer, housekeeper, and cafeteria attendant (R. 41). The ALJ asked whether the hypothetical person could perform the work if he or she were off-task 20 percent of the time or absent from work twice a month (R. 42-43). The VE testified that the person could not perform the aforementioned jobs because they require being on-task for at least 50 minutes each hour, and missing no more than one day of work a month (R. 43). Further, if a person needed a one-hour break after every three hours of work on a sustained basis, he or she could not perform any jobs (R. 44).

## IV.

In her October 2, 2009 opinion, the ALJ found Ms. Heuser was not under a disability from the alleged onset date of January 1, 2000, through the date of the decision (R. 17). At Step 1, she found that the work Ms. Heuser performed since January 1, 2000 was not substantial gainful activity (R. 11).[4] At Step 2, the ALJ determined Ms. Heuser suffered from a

---

[4] The ALJ did not use the amended onset date of August 2007.

combination of four severe impairments: PTSD, depression, cognitive disorder, and alcohol abuse (R. 11-12).

At Step 3, the ALJ concluded that Ms. Heuser did not have an impairment or combination of impairments that met or medically equaled any of the following Listings: 12.02, organic mental disorders; 12.04, affective disorders; 12.06, anxiety related disorders; or 12.09, substance addiction disorders (R. 12). Applying the Paragraph B criteria for functional limitations, the ALJ stated that Ms. Heuser had only mild restriction in ADLs; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation (*Id.*). The ALJ found that Ms. Heuser's impairments did not satisfy the Paragraph C criteria (*Id.*).

Next, the ALJ determined that Ms. Heuser had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels," but with the following nonexertional limitations: "only occasional contact with coworkers and supervisors, no contact with the general public, and simple repetitive work with no complex and detailed tasks" (R. 13). In making this determination, the ALJ found that Ms. Heuser's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the above RFC because Ms. Heuser "is not persuasive" (R. 13-14).

The ALJ questioned Ms. Heuser's testimony that she cannot be around people and cannot complete tasks because she shops, attends Bible study, and has worked as a waitress, cashier, and personal assistant (R. 13). Further, Ms. Heuser can attend to her ADLs, and does laundry, cleans, and cooks for someone else (*Id.*). The ALJ stated that Ms. Heuser's "difficulty working regularly could be attributed to binge drinking" (*Id.*).

The ALJ also found Ms. Heuser's statements inconsistent with the medical evidence. The ALJ stated that although Ms. Heuser was diagnosed with intracranial hemorrhage after her March 1998 head injury, she had "no further treatment or problems as related to the head injury" (R. 14). In addition, although Dr. Nemeth reported that Ms. Heuser was sad and anxious and her memory increasingly failed her on the job, his "examination revealed memory was intact" (*Id.*). The ALJ also noted Dr. Roe's report diagnosing Ms. Heuser with PTSD, alcohol dependence, and cognitive disorder, but the ALJ stated that the evidence was inconclusive as to whether Ms. Heuser's cognitive and memory problems were a result of her 1998 head injury, her history of alcoholism, or both (*Id.*). The ALJ also noted that Dr. Roe found Ms. Heuser's alcohol use was likely "a form of self medication" (*Id.*).

The ALJ gave "some weight" to Dr. Mahmood's August 2009 opinion, which diagnosed Ms. Heuser with PTSD, major depressive disorder, cognitive disorder, and alcohol dependence and "opined that the claimant had marked restriction of ADLs, marked difficulties in maintaining social functioning and concentration, persistence or pace, and repeated episodes of decompensation" (R. 14-15). The ALJ noted that Dr. Mahmood opined that Ms. Heuser's PTSD symptoms have "significantly impaired her ability to support herself, maintain consistent housing, work and successfully manage relationships," and that Ms. Heuser "could not successfully work full time and had difficulty maintaining even part-time employment" (R. 14-15). The ALJ stated that though Ms. Heuser visited DCHD in August 2007, Dr. Mahmood treated Ms. Heuser three times, between April 1, 2009 and June 4, 2009 (R. 15). The ALJ also gave "some weight" to the September 2009 opinion of Ms. Heuser's substance abuse counselor, Ms. McCarty, who had concluded that Ms. Heuser's substance abuse and mental health issues

were interrelated, and that both led to her inability to hold down a job (*Id.*). She had also recommended that Ms. Heuser continue treatment (*Id.*).

At Step 4, the ALJ found Ms. Heuser cannot perform her past relevant work as a cashier or waitress (R. 16). At Step 5, the ALJ found that given the Medical-Vocational Guidelines and the VE's testimony, a person of Ms. Heuser's age, education, work experience, RFC and limitations could perform the jobs of laundry laborer, order filler, hand packer, and housekeeper (*Id.*).

## V.

We begin our analysis of the ALJ's decision with a review of the relevant legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The social security regulations require the ALJ to apply the following sequential five-step analysis to determine whether a claimant is disabled under the law: (1) whether the claimant is currently performing any substantial gainful activity; (2) whether her alleged impairment or combination of impairments is severe; (3) whether any of her impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether she is unable to perform her past relevant work based on her RFC; and (5) whether her RFC renders her unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proof in Steps 1 through 4, and the burden shifts to the Commissioner in Step 5. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Judicial review of ALJ decisions is deferential: we uphold an ALJ's decision if it is supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). To meet this standard, the ALJ's opinion must build an accurate and logical bridge between the facts of the case and the outcome. *Clifford*, 227 F.3d at 872 (internal citations omitted). The ALJ must consider all relevant evidence, not only the evidence that favors his or her ultimate conclusion, and must articulate the reasons he or she rejected certain evidence. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (internal citations omitted).

## VI.

Ms. Heuser argues that the ALJ committed several errors in her opinion that warrant remand. We limit our discussion to the argument that the ALJ failed to give Dr. Mahmood's opinion controlling weight and inappropriately played doctor in determining her RFC (doc. # 20: Pl.'s Mem. at 10-12), which we find standing alone requires remand.

In assessing a claimant's mental impairments – the type of impairment at issue here – the ALJ must use the "special technique" set forth in 20 C.F.R. § 404.1520a. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). Under the special technique, the ALJ must evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to decide whether the claimant has a medically determinable impairment. *Id.* If the claimant does have such an impairment, the ALJ must rate the degree of functional limitation the impairment imposes upon the claimant's ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation (the "Paragraph B" criteria). *Id.*

Ms. Heuser's treating psychiatrist, Dr. Mahmood, provided the only assessment of the Paragraph B criteria by a medical professional in the record (R. 424). She found that Ms. Heuser's impairment caused marked restriction of ADLs; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration (*Id.*). By contrast, although the DDS psychological consultant, Dr. Hollerauer, filled out a PRTF, he made no determinations with respect to the Paragraph B criteria (*see* R. 334 (leaving Functional Limitations form blank)). Thus, while Dr. Hollerauer stated that Ms. Heuser did not meet or equal Listings 12.06 or 12.09, he failed to make the factual findings on the PRTF to support that conclusion. Dr. Pittman simply affirmed Dr. Hollerauer's conclusion (R. 386).

Nevertheless, the ALJ found that Ms. Heuser experienced only mild restriction in ADLs, moderate difficulties in maintaining social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation of extended duration (R. 12). The ALJ then determined that because the claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the Paragraph B criteria were not satisfied, and Ms. Heuser's mental impairments were not severe enough to meet or equal a listed impairment (*Id.*).

### A.

"Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue," whether the expert is a treating physician/psychologist or a DDS consulting physician/psychologist. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1526. In *Barnett*, the Seventh Circuit held that the ALJ erred in finding that the claimant's impairments did not meet or equal a listing

because the ALJ did not rely on a medical expert before making this finding. *Barnett*, 381 F.3d at 670. None of the DDS doctors issued findings on the question and the record lacked medical evidence to substantiate the ALJ's determination. *Id.* at 671.

Similarly, in this case, the ALJ did not rely on any medical evidence or expert in finding that Ms. Heuser's mental impairments do not meet or equal any of the Paragraph B criteria. Dr. Mahmood reported marked restrictions and difficulties and repeated episodes of decompensation, while the other medical experts in the record declined to opine on the Paragraph B criteria.

The lack of medical evidence in the record to substantiate the ALJ's determination leads to only one conclusion: that the ALJ reached her own independent medical conclusion, impermissibly playing doctor. *Myles*, 582 F.3d at 677-78. Because she did not rely upon the medical evidence or authority in the record in making her determination, the ALJ's opinion was not supported by substantial evidence.

## B.

Moreover, in impermissibly playing doctor, the ALJ failed to give Ms. Heuser's treating psychiatrist's opinion controlling weight, according only "some weight" to Dr. Mahmood's opinion (R. 15). The treating physician rule states that an ALJ must accord controlling weight to a treating source's medical opinion; the ALJ may discount a treating doctor's opinion only if the ALJ provides a sound explanation for doing so, such as if the treating doctor's opinion is internally inconsistent or contradicted by other evidence. *S.S.R. 96-2p; see also Jelinek*, 662 F.3d at 811.

In addition to finding marked difficulties under the Paragraph B criteria, Dr. Mahmood opined that Ms. Heuser's PTSD symptoms have "significantly impaired her ability to support

herself, maintain consistent housing, work and successfully manage relationships" (R. 442), and that Ms. Heuser "could not successfully work full time and had difficulty maintaining even part-time employment" (R. 443). Nevertheless, the ALJ determined that Ms. Heuser had the RFC to perform a full range of work at all exertional levels, but with certain nonexertional limitations (R. 13). The ALJ, however, never made the required finding that Dr. Mahmood's opinion was internally inconsistent or contradicted by other evidence. *See Jelinek*, 662 F.3d at 811.

Furthermore, "even if there had been sound reasons for refusing to give [Dr. Mahmood's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit," by considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). The only factor that the ALJ appeared to consider, however, was the short length of Dr. Mahmood's treatment relationship with Ms. Heuser, from April 2009 to June 4, 2009 (R. 15). This, in itself, misstates the evidence, as prior to the ALJ hearing, Ms. Heuser actually made six, not three, documented visits to Dr. Mahmood, from April 2009 to August 2009 (R. 433-36 (Apr. 16, 2009); R. 431-32 (Apr. 23, 2009); R. 429-30 (May 7, 2009); R. 427-28 (June 4, 2009); R. 426 (June 18, 2009); R. 425 (July 16, 2009)). As in *Scott*, these shortcomings in evaluating Dr. Mahmood's opinion require remand. *See Scott*, 647 F.3d at 740; *see also Suide v. Astrue*, 371 Fed. Appx. 684, 688-90 (7th Cir. 2010) (holding that the ALJ improperly rejected the opinion of a treating physician – who treated the claimant for nine months, but mistakenly appeared in the record as having treated her for one month – that the claimant was unable to work due to a disability, as the ALJ did not have a sufficient evidentiary basis to support the parameters set in the ALJ's RFC determination).

## C.

An ALJ must consider all the relevant evidence in determining whether a claimant is disabled, and may not selectively consider medical reports, especially those of treating physicians. *Myles*, 582 F.3d at 678. The ALJ failed to do so here, as she improperly ignored medical evidence that was consistent with Dr. Mahmood's opinion.

For example, the ALJ cited Dr. Nemeth's evaluation to support the statement that Ms. Heuser's memory was intact (R. 15), but Dr. Nemeth never made such a finding. Also, the ALJ did not mention that the test results from Dr. Roe's July 2008 evaluation showed that Ms. Heuser functioned in the bottom one percentile of her age group for memory recall (R. 384; *see* R. 14). The ALJ's RFC assessment failed to address how memory lapses may affect Ms. Heuser's ability to stay on-task for periods sufficient to sustain full-time employment, which was significant given that the VE testified that a person who is off-task 20 percent of the time would be unable to perform any of the jobs he identified (R. 43).

Likewise, the ALJ made no mention of Ms. Heuser's GAF assessment. Between August 2007 and April 2009, three different doctors assigned Ms. Heuser GAF scores ranging between 45 and 55 (R. 320, R. 383, R. 436), denoting moderate to serious symptoms or impairment in social or occupational functioning. The ALJ's failure to address these GAF assessments by three different medical professionals was a significant omission.

## **CONCLUSION**

For the reasons set forth above, we grant Ms. Heuser's motion for reversal and/or remand (doc. # 19), and we deny the Commissioner's motion to affirm (doc. # 24). On remand the ALJ should consider the foregoing points and, to the extent necessary, supplement the medical record. Any decision to give less than controlling weight to Ms. Heuser's treater's opinions

must be explained in the manner required by the regulations and case law.[5] This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 9, 2012

---

[5]Although we do not decide the challenge that plaintiff levels at the ALJ's determination of her credibility, this is an issue that merits the ALJ's close attention on remand. In particular, we highlight two points. *First*, if the ALJ seeks to rely on Ms. Heuser's daily activities as a reason to discount her statements of limitations, the ALJ must take care not to conflate the claimant's ability to complete tasks on a limited basis in her own terms and her ability to perform the requirements of a full-time job on a daily basis. The Seventh Circuit has recognized this as a "recurrent" problem that ALJs should take pains to avoid. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer"). *Second*, to the extent the ALJ suggests that the credibility of Ms. Heuser's statements of limitations is undermined by her failure to take medication, the ALJ must explain why that is so even though the medical record shows that the reason for lack of medication is Ms. Heuser's inability to tolerate its side effects (*see, e.g.*, R. 421, R. 425, 427, R. 429, R. 431). *See also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).